UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHEVRON USA, INC.                          CIVIL ACTION

VERSUS                                     NO: 03-2027

AKER MARITIME INC, ET AL                   SECTION: "J" (2)


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On remand from the United States Fifth Circuit, this Court[1]
must determine the contractual rights and obligations of
Plaintiff Chevron USA, Inc. ("Chevron"), Defendant Aker Maritime
Inc. ("Aker"), Defendant T-3 Custom Coating Applicators, Inc.
("Lone Star"), and Defendant Oceaneering International, Inc.
("Oceaneering").

On October 21, 2010, counsel for Chevron and Lone Star
notified the Court that they resolved all their claims through
settlement. Further, Aker withdrew all its claims for contractual
defense and indemnity against Lone Star (Rec. Doc. 582, at 17).

---

[1]The case was originally assigned to District Judge Peter
Beer who has since retired.

Thus, the only claims for the Court to resolve are contractual indemnity between Aker and Oceaneering. Aker submitted a memorandum in support of its contractual indemnity claim against Oceaneering (Rec. Doc. 582). Oceaneering filed a Memorandum in response to Aker's Claim (Rec. Doc. 585). Aker filed a Reply (Rec. Doc. 594).

**PROCEDURAL HISTORY AND BACKGROUND FACTS:**

Chevron is a part-owner and operator of an oil processing facility the Genesis Spar, located 150 miles south of New Orleans in the Gulf of Mexico. Chevron hired Aker in 1998 to provide design and engineering services for the initial construction of the riser system for the Genesis Spar. Stability problems plagued the riser system after its completion, leading to a crack in the spar's hull in 2000. Oceaneering repaired the hull at Chevron's request, and Chevron put Aker in charge of designing a permanent fix.

In its construction of the riser system, Aker ordered some large carriage bolts from Lone Star. Aker initially requested Grade 5 carriage bolts, which Chevron had approved. When Lone Star responded that it had no Grade 5 bolts, Aker placed an order for Grade 2 carriage bolts. Instead of shipping Grade 2 bolts, Lone Star shipped Grade A bolts manufactured by Oriental Fastener Co. ("Oriental"). At the time, Lone Star routinely substituted

Grade A bolts for Grade 2 bolts, then a widespread practice in the fastener industry. Lone Star shipped the bolts to Oceaneering, which was in charge of assembling the risers. The bolts were marked "OF," indicating the manufacturer, and arrived in shipping boxes bearing the Lone Star mark. They also arrived with a packing slip noting that they were either "manufactured or distributed" by Lone Star. Oceaneering accepted the bolts, failing to notice the substitution.

The first bolt failure occurred on July 9, 2001, when a bolt head popped off one of the first bolts used in the risers. Jack Couch, the project manager for Oceaneering, contacted Aker's Mike Harville and told Harville that he thought the bolts were a "serious weak link." Couch took a picture of the failed bolt and sent it to Harville. Harville told Oceaneering that it had applied too much torque to the bolt, as Oceaneering was applying torque to Grade 2 bolts that it believed to be Grade 5 bolts. Oceaneering continued assembly of the riser system using the torque appropriate for Grade 2 bolts, apparently without incident. In August 2001, however, Aker took over riser assembly, and Oceaneering sent the parts, including the bolts, to Aker. Like Oceaneering's employees, Aker's employees failed to detect that the bolts were Grade A bolts.

After Aker completed installation of the riser system,

3

Oceaneering divers inspected the construction on July 12 and 13,
2002. During the dives, live audio and video were fed to a room
aboard the Genesis Spar, where Chevron representatives could see
and hear everything the divers saw. As documented in
Oceaneering's diving logs, the video inspection showed several
bolt heads were missing. In addition, Harville testified that a
Chevron employee, Bill Donahue, called him regarding a problem
with bolt installation. In the next month, Aker, Oceaneering and
Chevron representatives investigated the bolt failures. During
the review, the team discovered that the bolts were Grade A, not
Grade 2. It later determined that not only were the bolts the
wrong kind, they were also defective due to a defective
manufacturing process, including failure to stress-relieve the
bolts and to heat-treat them.

Chevron sued on July 15, 2003, a year and a day after the
Oceaneering dives, but less than a year after it completed its
investigation. Chevron's complaint included claims for
negligence, strict liability, redhibition, products liability,
and breach of contract. Aker brought claims for indemnity against
Oceaneering and Lone Star. To avoid inconsistent verdicts, the
parties agreed to try all the claims other than the contract
claims to a jury, after which the district court would make
factual findings based on the trial record and render judgment on

4

the contract claims. The jury returned a verdict in favor of
Chevron on all claims. It found that none of Chevron's claims
were prescribed. As to negligence, it found Aker, Lone Star,
Oriental, and Oceaneering were all negligent and it apportioned
fault under La. Civ. Code art. 2323: 40 percent to Aker, 35
percent to Lone Star, 5 percent to Oceaneering, and 20 percent to
Oriental. It determined that Lone Star and Oriental were
manufacturers and imposed liability in redhibition and under the
LPLA. Finally, it determined that Chevron's total damages were
$2,968,526.42.

The district court determined that "[t]he jury verdict
clearly, and in all respects, trumps the so-called 'contractual
issues.'" In the same order, the court directed the magistrate
judge to determine the attorney fees owed by Lone Star and
Oceaneering under La. Civ. Code art. 2545 and noted, "It seems to
me that [Lone Star and Oriental] should split the amount due by
the percentage of fault the jury attributed to each; and that the
total fee should only cover that part of the recovery attributed
to the liability of the two manufacturers." On October 12, the
district court entered judgment, apportioning the damages
according to the jury's fault allocation, regardless of the
theory of liability. Lone Star and Aker moved for judgment as a
matter of law, which the district court denied. Chevron, Lone

Star, and Aker timely appealed.

On January 2, 2008, the magistrate judge recommended $431,906.63 in attorney fees for Chevron. After reviewing the relevant Louisiana case law, he concluded that Oriental and Lone Star should be solidarily liable for the amount. The district court delayed consideration of the magistrate judge's recommendation pending the Louisiana Supreme Court's decision in Aucoin v. Southern Quality Homes, LLC, 2007-1014 (La. 2/26/08); 984 So. 2d 685, which it hoped would resolve whether co-defendants are solidarily liable for damages in redhibition. Because the supreme court did not reach that issue, id. at 693, the district court simply confirmed its original impression that Lone Star and Oriental should split the fees according to fault in a February 29 order. On March 18, it entered judgment, with Lone Star to pay $151,167.32 and Oriental to pay $86,381.33. Chevron would not be able to collect the remaining $194,357.98 in attorney fees. Chevron timely appealed this judgment.

Before oral argument, Chevron and Aker reached a settlement, in which Aker paid a sum to Chevron but admitted no fault, after which those parties voluntarily dismissed their appeals insofar as they were adverse to one another.

On appeal, the Fifth Circuit held that the evidence was sufficient for the jury to find Lone Star liable as an apparent

manufacturer and affirmed the judgment for damages. <u>Chevron USA, Inc. v. Aker Maritime, Inc.</u>, 604 F.3d 888, 890-892 (5th Cir. 2010). However, the Fifth Circuit reversed the finding that Lone Star is liable under the Louisiana redhibition articles and vacated the judgment of attorney fees. The Fifth Circuit then remanded the contract claims to the district court for further consideration. This Court must now address the remaining claims of Aker against Oceaneering for contractual indemnity.

**THE PARTIES' ARGUMENTS:**

Aker avers that, as Chevron's procurement agent under the Support Services Contract, Aker is entitled to indemnification from the party who contractually agreed to indemnify Chevron's agents: Oceaneering. When Aker ordered Grade 2 carriage bolts from Lone Star and directed Lone Star to deliver those bolts to Chevron's contractor, Oceaneering, Aker was acting as Chevron's agent. Oceaneering, under its Master Services Order and Agreement with Chevron, contracted with Chevron to hold Chevron's agents harmless. Chevron's receiving contractor Oceaneering failed to detect that Lone Star made an unauthorized substitution, triggering Chevron's claims against Aker, which were settled. Aker concludes that it is entitled to complete indemnification as Chevron's agent under Oceaneering MSA with Chevron. Pending appeal, Aker and Chevron settled for $1,250,000.00, which amount

Aker now seeks to recover from Oceaneering. Furthermore, in the event this Court finds that indemnity (including attorneys fees and costs) is owed by Oceaneering, Aker requests that the evidentiary hearings be held to quantify attorneys fees, litigation costs, and the amount of settlement indemnification due Aker.

In response, Oceaneering contends that Judge Beer properly dismissed Aker's contractual claims. Aker was Chevron's independent contractor, with a limited mandate to procure equipment, materials, and services for Chevron. However, in this situation, Aker did not procure equipment, materials, and services from Oceaneering and thus never acted as Chevron's agent. Moreover, Aker was Chevron's limited agent that did not qualify for indemnity provisions. As such, Oceaneering is not bound to indemnify Chevron's contractors. Oceaneering also avers that the Support Services Contract does not authorize Aker to sue contractors from whom it procured goods and services on behalf of Chevron. Finally, Oceaneering argues that Aker is not a third party beneficiary under the Chevron-Aker contract.

Aker's Reply (Rec. Doc. 594) disagrees with Oceaneering interpretation of the contract that Aker could only have been Chevron's agent as to Oceaneering if Aker had ordered something from Oceaneering. Aker argues that this position is not supported

by any contract language, evidence, statute, or jurisprudence. Further, Aker argues that Oceaneering misinterprets another provision of the contract, which really limits Aker's liability to Chevron, instead of limiting Aker's right to sue, as alleged by Oceaneering. Aker reiterates that its procurement function was at all times performed in its capacity as Chevron's express agent. Oceaneering's concurrent negligence triggered its contractual obligation to indemnify and defend Chevron's agent, Aker, even for its own negligence.

**DISCUSSION:**

There is no legal principle which prohibits parties from expressly agreeing to a contract of indemnification in the event of personal injury, property damage, or economic loss to a third person.  However, "[a] contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms."  Polozola v. Garlock, Inc., 343 So. 2d 1000, 1003 (La. 1977).  Whenever there is "anything doubtful in agreements, including indemnity agreements, we must endeavor to ascertain what was the common intention of the parties, rather than adhere to the literal sense of the terms."

<u>Id.</u> at 1003. The party seeking to enforce an agreement to
indemnify bears the burden of proof.  <u>McKinney v. South Cent.</u>
<u>Bell Tel. Co.</u>, 590 So. 2d 1220, 1222 (La. App. 1 Cir. 1991).

Aker and Oceaneering entered separate written contracts with
Chevron.  Both Aker and Oceaneering acted, at times, as limited
agents of Chevron, primarily with respect to procurement.
Occasionally, Aker and Oceaneering dealt with each other
directly; however, that activity was at the direction of Chevron.
Aker and Oceaneering did not contract with each other directly.
Thus, in order to determine whether Oceaneering must indemnify
Aker, the Court will review the contract between Chevron and
Aker, which allegedly makes Aker Chevron's agent, and the
agreement between Chevron and Oceaneering, whereby Oceaneering
promises to indemnify Chevron's agents.

First, we establish whether Aker falls under the definition
of an "indemnitee" under the Chevron-Oceaneering agreement.
Paragraph 1(c) of the Chevron-Aker contract describes Aker as an
independent contractor; however, paragraph 1(d) of the same
contract refers to Aker as "Agent for [Chevron]" for the limited
purpose of procuring equipment, supplies, and services as
required to carry out its obligations under the contract.
Furthermore, the indemnification clause from the Chevron-
Oceaneering contract names Chevron and "all of [its] agents" as

indemnitees. Hence, the plain language of the indemnity clause requires Oceaneering to indemnify all of Chevron's agents, including Chevron's limited procurement agents. When Aker ordered the bolts from Lone Star, it was acting as Chevron's procurement agent. Aker's liability in this case is related to its function as an agent, which falls squarely within the language of the indemnity clause.

Second, we consider the scope of the indemnity clause. Paragraph 6(b) of the Chevron-Oceaneering contract provides that Oceaneering "shall be liable to and hold INDEMNITEES harmless for any loss or damage to the property of [Chevron] . . . arising out of, connected with, incident to, directly or indirectly resulting from or related to [Oceaneering's] performance of this Agreement . . . , regardless of the passive, concurrent or active negligence of . . . INDEMNITEES." This provision mandates Oceaneering to indemnify Chevron and its agents for all damage connected with, or even indirectly resulting from, Oceaneering's performance. Moreover, this provision "expressly and unequivocally" states that Oceaneering is bound to indemnify Chevron's agents, regardless of the agents' own negligence, so long as the damage is connected with Oceaneering's performance. Polozola, 343 So. 2d at 1003. As Chevron's receiving contractor, Oceaneering failed to detect that Lone Star made an unauthorized

11

substitution, which gave rise to Chevron's claims against Aker. Hence, this scenario falls within the language of the indemnity clause, making Oceaneering liable to Aker. Although the Court acknowledges the breadth of the indemnity clause, nothing prevents sophisticated parties from bargaining for favorable contract terms. As such, "[t]here is no reason to extricate the parties from their bargain." East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 875 (U.S. 1986).

For the foregoing reasons, the Court concludes that Oceaneering must indemnify Aker under the provision of the Chevron-Oceaneering agreement. Accordingly, **IT IS ORDERED** that a telephone status conference in the above-captioned case be held on **Friday, November 12, 2010 at 10:00 a.m.** to discuss how the case will proceed. The Court will initiate the call.

New Orleans, Louisiana, this 2nd day of November, 2010.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

12